## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT E. MORLEY, JR. and** | § | |
| **REM HOLDINGS 3, LLC** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 14-CV-00172** |
| **vs.** | § | |
| | § | |
| **SQUARE, INC., JACK DORSEY, and** | § | **JURY TRIAL DEMANDED** |
| **JAMES MCKELVEY, JR.** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

The publicized origin story of Square, Inc. is a fabrication.  The business now known as Square was not created solely by Jack Dorsey and James McKelvey.  It was Professor Robert Morley—and Dr. Morley alone—who invented the Square card reader, and Dr. Morley co-invented the corresponding magnetic stripe decoding algorithms of the Square app.  Dr. Morley had over a decade of experience in the credit card industry, spanning card reader technology, industry contacts, and business operations.  In contrast, Messrs. Dorsey and McKelvey had no noteworthy experience in the credit card industry.  Dorsey, Morley, and McKelvey worked together in a joint venture with the goal of entering the mobile credit card transaction industry using Dr. Morley's invention.  In addition to inventing the Square card reader, which enabled Square's entry into the mobile credit card transaction industry, Dr. Morley contributed his technological expertise and knowledge of the credit card industry to the joint venture.  But Messrs. Dorsey and McKelvey betrayed the joint venture by incorporating Square, Inc., dictating the ownership of the newly incorporated company, and cutting Dr. Morley completely out of the

enterprise.  And in an attempt to whitewash these transgressions, Square has embroiled Dr. Morley in years of litigation and proceedings before the United States Patent and Trademark Office—forcing him to defend himself against the company he helped create.  This lawsuit seeks justice for Dr. Morley, redress and redemption.

Plaintiffs Robert E. Morley, Jr. ("Dr. Morley") and REM Holdings 3, LLC ("REM") file this Original Complaint against Defendants Square, Inc., Jack Dorsey ("Mr. Dorsey"), and James McKelvey, Jr. ("Mr. McKelvey") for unjust enrichment, breach of the joint venture agreement, breach of fiduciary duty, patent infringement under 35 U.S.C. § 271, constructive trust, civil conspiracy, correction of inventorship of Square, Inc.'s patents under 35 U.S.C. § 256, conversion, negligent misrepresentation, fraudulent nondisclosure, misappropriation of trade secrets, and fraud.  Plaintiffs allege, based on their own personal knowledge with respect to their own actions and based upon information and belief with respect to all others' actions as follows:

## THE PARTIES

1.  Plaintiff Dr. Morley is a citizen of the State of Missouri and resides in University City, St. Louis County, Missouri.

2.  Plaintiff REM is a Missouri limited liability company organized and existing under the laws of the State of Missouri, and maintains its principal place of business in University City, St. Louis County, Missouri.

3.  Defendant Square, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.  Square, Inc. has designated National Registered Agents, Inc., 160 Greentree Dr., Ste. 101, Dover, DE 19904 as its agent for service of process.

4.  Defendant Mr. Dorsey is a citizen of the State of California and resides in San Francisco, California.

5.    Defendant Mr. McKelvey is a citizen of the State of Florida and to reside in Miami, Florida.

## JURISDICTION AND VENUE

6.    This action includes a claim of patent infringement and for correction of inventorship of certain patents assigned to Square arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.    In addition to jurisdiction based upon a federal question, there is jurisdiction under 28 U.S.C. § 1332(a) because of diversity of citizenship in that Plaintiffs are citizens of the State of Missouri and Defendants are citizens of other states, and the amount in controversy in excess of $75,000, exclusive of interest and costs.

8.    This Court has jurisdiction over the state law claims of unjust enrichment, breach of the joint venture agreement, breach of fiduciary duty, constructive trust, civil conspiracy, conversion, negligent misrepresentation, misappropriation of trade secrets, negligent misrepresentation, and fraud under 28 U.S.C. §§ 1332(a) and 1367.

9.    This Court has personal jurisdiction over Square.  Square conducts business and has committed acts of patent infringement and/or has induced acts of patent infringement by others in this district and/or has contributed to patent infringement by others in this district, the State of Missouri, and elsewhere in the United States.

10.   This Court has personal jurisdiction over Mr. Dorsey.  Mr. Dorsey conducts business in and has substantial contacts with the State of Missouri and took certain of the actions complained of herein in the State of Missouri.

11.  This Court has personal jurisdiction over Mr. McKelvey.  Mr. McKelvey conducts business in and has substantial contacts with the State of Missouri and took certain of the actions complained of herein in the State of Missouri.

12.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b) because, among other things, all Defendants are subject to personal jurisdiction in this district, have regularly conducted business in this judicial district, and certain of the acts complained of herein occurred in this judicial district.

## FACTUAL ALLEGATIONS

13.  Dr. Morley and Mr. McKelvey had a special and confidential relationship.

14.  Dr. Morley and Mr. McKelvey have known each other for over 20 years.

15.  Dr. Morley and Mr. McKelvey were friends.

16.  Dr. Morley and Mr. McKelvey would frequently confide in each other.

17.  Dr. Morley and Mr. McKelvey had a trusting relationship.

18.  Mr. McKelvey knew that Dr. Morley had expertise in the credit card industry.

19.  Mr. McKelvey knew that Dr. Morley was, and had been, an entrepreneur.

20.  Dr. Morley acted as a mentor to Mr. McKelvey on entrepreneurial and technical matters.

21.  Mr. McKelvey approached Dr. Morley in 2008 and raised the possibility of entering into a joint venture with Messrs. McKelvey and Dorsey.

22.  Mr. McKelvey asked Dr. Morley if Dr. Morley would be interested in joining the joint venture.

23.  The first idea that Mr. McKelvey proposed for a joint venture was an open source automobile.

24.  Dr. Morley expressed skepticism about this idea and indicated he was not interested in the open source automobile idea.

25. Despite Dr. Morley's lack of interest in the open source automobile idea, Mr. McKelvey expressed hope that Dr. Morley would remain interested in the possibility of entering into a joint venture with Messrs. McKelvey and Dorsey.

26. In February 2009, Mr. McKelvey came to Dr. Morley's house and proposed another idea for a joint venture.

27. Specifically, Mr. McKelvey proposed a business that processed credit card transactions using a smartphone by taking a picture of a credit card and performing optical character recognition to obtain card information to begin processing a transaction.

28. Dr. Morley's reaction was that this was a bad idea, and Dr. Morley solely conceived the invention of reading the magnetic stripe of a card with a card reader, inputting the signal of the card reader into the audio jack of a mobile device, and decoding that signal into the card information using the processing capability of the mobile device.

29. Having conceived this invention, Dr. Morley told Mr. McKelvey that a better solution than taking a picture of the credit card would be to read the magnetic stripe.

30. Mr. McKelvey responded that he and Mr. Dorsey did not know how to read the magnetic stripe of a card, and Dr. Morley told Mr. McKelvey that he could build a prototype of his invention to show that it could be done.

31. At this time, Mr. McKelvey operated a glass blowing studio and neither he nor Mr. Dorsey had any significant experience with or knowledge of the credit card industry.

32. In contrast, Dr. Morley had considerable experience and expertise in the credit card industry.

33. Around 1995, Dr. Morley began working on a joint project with MagTek and Washington University in St. Louis involving the reading of the magnetic stripe of credit

cards.  This work spanned several years and Dr. Morley maintained a research lab at Washington University to conduct research and development using magnetic stripes and card readers.  In working on this project, Dr. Morley gained experience in card reading technology, developed industry contacts, and learned the business operations of the credit card industry.

34.   Mr. McKelvey often visited Dr. Morley's research lab and knew of Dr. Morley's experience and expertise in the credit card industry.

35.   In February 2009, Mr. McKelvey proposed a joint venture between Dr. Morley, Mr. McKelvey, and Mr. Dorsey to create a business to process credit card transactions using a mobile device.  Dr. Morley agreed to be part of the joint-venture with Messrs. McKelvey and Dorsey, and Mr. McKelvey confirmed to Dr. Morley that he was part of the joint-venture.

36.   Dr. Morley placed in Mr. McKelvey, and Mr. McKelvey knowingly accepted, his trust and confidence regarding his future with the business.

37.   Dr. Morley solely conceived the invention of reading the magnetic stripe of a card with a card reader, inputting the signal of the card reader into the audio jack of a mobile device, and decoding that signal into the card information using the processing capability of the mobile device.

38.   On February 19, 2009, Dr. Morley created and constructed a prototype card reader in accordance with his conception that read the magnetic stripe of a card and input the signal of the card reader into the audio jack of a mobile device.

39.     On that day, Dr. Morley operated and tested his prototype and was able to demonstrate that it worked for its intended purpose by capturing the signal read from the card reader that was input into his iPhone through the audio jack.

40.     Dr. Morley saved the captured signal as a picture and emailed that picture to Mr. McKelvey.

41.     Having demonstrated the viability of Dr. Morley's invention, Mr. Dorsey, Dr. Morley, and Mr. McKelvey set about creating and developing a business to enter the mobile credit card transaction industry centered around Dr. Morley's invention.

42.     Dr. Morley contributed significantly to this joint venture.  In addition to inventing the Square card reader and the corresponding magnetic stripe decoding algorithms of the Square app, Dr. Morley directed the enterprise using his experience in the design of hardware, his knowledge of transaction processing, his knowledge of magnetic stripe encoding, his contacts in the industry, his technical expertise in read head design requirements, and his electrical engineering background.  Additionally, Dr. Morley directed the enterprise using his entrepreneurial experience.  Dr. Morley also provided business advice related to the business plan of the enterprise, fraud and chargebacks, the transaction rate at which Square's transaction fees would be competitive in the industry, and marketing.  Dr. Morley also identified and recruited Mr. Xuancong ("Sam") Wen, and supervised Mr. Wen who was tasked with programming the decoding algorithms of the Square app under Dr. Morley's direction.

43.     Dr. Morley provided his contribution and direction toward the commercialization of his invention and toward developing the code for the decode algorithms to be performed by

the cell phone or other mobile host device because he agreed to be a part of the joint venture and also because of his trust in Mr. McKelvey.

44. As detailed above, Mr. Dorsey, Dr. Morley, and Mr. McKelvey created a joint venture.

45. In this joint venture, Mr. Dorsey, Dr. Morley, and Mr. McKelvey agreed to create and develop a mobile credit card transaction business.

46. The joint venture used Dr. Morley's inventions, specifically the Square card reader and the corresponding magnetic stripe decoding algorithms of the mobile host device that later became known as the "Square app."

47. As part of this joint venture, Dr. Morley filed a patent application for his invention of reading the magnetic stripe of a card with a card reader and inputting the signal of the card reader into the audio jack of a mobile device. *See* Ex. A (email exchange between Dr. Morley and Mr. Dorsey).

48. The common purpose of the joint venture was to enter the mobile credit card transaction industry.

49. Mr. Dorsey, Dr. Morley, and Mr. McKelvey shared a community of pecuniary interest in this common purpose.

50. In this joint venture, Mr. Dorsey, Dr. Morley, and Mr. McKelvey had an equal voice, giving an equal right of control in the direction of the enterprise.

51. Dr. Morley was not compensated for his efforts toward the joint venture.

52. Messrs. Dorsey and McKelvey compensated others that assisted the joint venture.

53. Dr. Morley incurred unreimbursed expenses while participating in the joint venture.

54.     Because Messrs. Dorsey and McKelvey agreed to be part of a joint-venture with Dr. Morley, and because of the special and confidential relationship between Mr. McKelvey and Dr. Morley, Messrs. Dorsey and McKelvey owed Dr. Morley a fiduciary duty.

55.     Messrs. Dorsey and McKelvey breached their fiduciary duty to Dr. Morley.  For example, Mr. Dorsey personally incorporated a new company (which became Square, Inc.) and wrongfully excluded Dr. Morley from ownership in and control of the company. Mr. McKelvey wrongfully excluded Dr. Morley from ownership in and control of the company.  Mr. McKelvey conspired with Mr. Dorsey in excluding Dr. Morley from ownership in and control of the company.  Additionally, Messrs. Dorsey and McKelvey directed all revenues and assets attributable to the joint venture into the new company, used those resources to sue Dr. Morley, attempted to invalidate his patents, filed a lawsuit against Dr. Morley falsely claiming Mr. McKelvey to be a co-inventor of Dr. Morley's patents, and have promoted themselves as the sole founders of the business and technology to the exclusion of Dr. Morley.

56.     Messrs. Dorsey and McKelvey breached their fiduciary duties to Dr. Morley by failing to disclose their plans to exclude Dr. Morley from ownership in and control of the new company they planned to incorporate to exploit Dr. Morley's invention.

57.     As a direct and proximate cause and result of Messrs. Dorsey and McKelvey breaching their fiduciary duty, Dr. Morley was harmed.

58.     As discussed above, Dr. Morley provided considerable benefits to Mr. Dorsey, Mr. McKelvey, and Square, Inc.

59.     Mr. Dorsey, Mr. McKelvey, and Square, Inc. appreciated the benefits provided by Dr. Morley.

60.     Mr. Dorsey, Mr. McKelvey, and Square, Inc. accepted and retained the benefits provided by Dr. Morley in circumstances that render that retention inequitable. For example, Mr. Dorsey and Mr. McKelvey sought out Dr. Morley because of his expertise, used and relied on his expertise to create a business and develop the core technology that would enable the business, and cut him out of the newly formed Square, Inc. after receiving and realizing all of the benefits of Dr. Morley's expertise and contributions that were critical to creating the business. Square, Inc. is also unjustly enriched by filing for and receiving patent claiming that the inventions claimed and described in such patents were solely owned by Square when such inventions were at least co-invented and therefore jointly owned by Dr. Morley.

61.     As a result of Dr. Morley's contributions, the value of Square, Inc. has grown to a recent valuation of $5 billion.

62.     Mr. Dorsey and Mr. McKelvey are two or more persons.

63.     Mr. Dorsey and Mr. McKelvey conspired with the objective of owning the lion's share of the company and excluding Dr. Morley from receiving his share as a co-founder.

64.     Mr. Dorsey and Mr. McKelvey came to a meeting of the minds as to the objective of owning the lion's share of the company and excluding Dr. Morley from receiving his share as a co-founder.

65.     Mr. Dorsey and Mr. McKelvey committed unlawful, overt acts in furtherance of their conspiracy, including acts of breach of their fiduciary duties to Dr. Morley, unjust enrichment, conversion, defrauding Dr. Morley, omitting Dr. Morley as a co-inventor on patent applications filed by Square when he should have been named, misappropriation

of trade secrets, and falsely claiming co-inventorship of Dr. Morley's invention in a lawsuit.

66.  As a direct and proximate cause and result of Messrs. Dorsey's and McKelvey's conspiracy, Dr. Morley was harmed by, for example, being excluded from ownership in and control of the business, being deprived of just compensation for the benefits he conferred to the business, and having to defend himself against McKelvey's and Square, Inc.'s baseless lawsuit.

67.  Instead of honoring his obligations to Dr. Morley, Mr. Dorsey transferred some shares of Square, Inc. to Dr. Morley.  Dr. Morley gave no value or consideration to Mr. Dorsey in exchange for these shares (such as waiving any claims against Defendants), and the transfer of the shares constituted a bona fide gift to Dr. Morley.

68.  On November 19, 2013, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,584,946 (the "'946 patent"), entitled "Card Reader Device for a Cell Phone and Method of Use."  A true and correct copy of the '946 patent is attached hereto as Ex. B.

69.  Because Messrs. Dorsey and McKelvey breached their joint venture agreement and their fiduciary duties to Dr. Morley, Dr. Morley assigned his patents to REM instead of Square, Inc.

70.  REM owns all rights, title, and interest in and to the '946 patent and possesses all rights of recovery.

### COUNT ONE: BREACH OF JOINT VENTURE AGREEMENT

71.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

72.  As detailed above, Mr. Dorsey, Dr. Morley, and Mr. McKelvey created a joint venture.

73.   In this joint venture, Mr. Dorsey, Dr. Morley, and Mr. McKelvey agreed to create and develop a mobile credit card transaction business.

74.   This joint venture used Dr. Morley's inventions, specifically the Square card reader and the corresponding magnetic stripe decoding algorithms of the Square app.

75.   The common purpose of the joint venture was to enter the mobile credit card transaction industry.

76.   Mr. Dorsey, Dr. Morley, and Mr. McKelvey shared a community of pecuniary interest in this common purpose.

77.   In this joint venture, Mr. Dorsey, Dr. Morley, and Mr. McKelvey had an equal voice, giving an equal right of control in the direction of the enterprise.

78.   Dr. Morley was not compensated for his efforts toward the joint venture.

79.   Messrs. Dorsey and McKelvey compensated others that assisted the joint venture.

80.   Dr. Morley incurred unreimbursed expenses while participating in the joint venture.

81.   Within the joint venture, Dr. Morley had equal ownership and control (*e.g.*, one-third ownership and control) over the joint venture and over the joint venture assets, including not only his contributions but also the contributions of Messrs. Dorsey and McKelvey. *See* Mo. Rev. Stat. § 358.180; § 358.240.

82.   Messrs. Dorsey and McKelvey breached their joint venture agreement with Dr. Morley by refusing to recognize Dr. Morley's one-third ownership and control interests, incorporating a new company, funneling all assets out of the joint venture and into that new company, and excluding Dr. Morley from ownership in and control of that company.

83.   As a direct and proximate cause and result of Messrs. Dorsey and McKelvey's breach, Dr. Morley has suffered actual and consequential damages.

## COUNT TWO: BREACH OF FIDUCIARY DUTY

84.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

85.    As detailed above, Dr. Morley and Mr. McKelvey had a special and confidential relationship.  For example, Dr. Morley placed in Mr. McKelvey, and Mr. McKelvey knowingly accepted, his trust and confidence regarding his future with the business to enter the mobile credit card transaction industry centered around Dr. Morley's invention.

86.    As detailed above, Mr. Dorsey, Dr. Morley, and Mr. McKelvey created a joint venture.

87.    In this joint venture, Mr. Dorsey, Dr. Morley, and Mr. McKelvey agreed to create and develop a business using Dr. Morley's inventions, specifically the Square card reader and the corresponding magnetic stripe decoding algorithms of the Square app.

88.    The common purpose of the joint venture was to enter the mobile credit card transaction industry.

89.    Mr. Dorsey, Dr. Morley, and Mr. McKelvey shared a community of pecuniary interest in this common purpose.

90.    In this joint venture, Mr. Dorsey, Dr. Morley, and Mr. McKelvey had an equal voice, giving an equal right of control in the direction of the enterprise.

91.    Because Messrs. Dorsey and McKelvey agreed to be part of a joint venture with Dr. Morley, and because of the special and confidential relationship between Mr. McKelvey and Dr. Morley, Messrs. Dorsey and McKelvey owed Dr. Morley a fiduciary duty.

92.    Messrs. Dorsey and McKelvey breached their fiduciary duties to Dr. Morley.  For example, Mr. Dorsey personally incorporated a new company (which became Square, Inc.) and wrongfully excluded Dr. Morley from ownership in and control of the company. Mr. McKelvey wrongfully excluded Dr. Morley from ownership in and control of the

company.  Mr. McKelvey conspired with Mr. Dorsey in excluding Dr. Morley from ownership in and control of the company.

93.     Additionally, Messrs. Dorsey and McKelvey directed all revenues and assets attributable to the joint venture into the new company, used those resources to file a lawsuit against Dr. Morley falsely claiming Mr. McKelvey to be a co-inventor of Dr. Morley's patents, attempted to invalidate Dr. Morley's patents, and have promoted themselves as the sole founders of the business and technology to the exclusion of Dr. Morley.

94.     Messrs. Dorsey and McKelvey breached their fiduciary duties to Dr. Morley by failing to disclose their plans to exclude Dr. Morley from ownership in and control of the new company they planned to incorporate to exploit Dr. Morley's invention.

95.     As a direct and proximate cause and result of Messrs. Dorsey and McKelvey breaching their fiduciary duties, Dr. Morley was harmed.

96.     Mr. Dorsey and Mr. McKelvey carried out the actions described above with evil motive and reckless indifference to Dr. Morley's rights, and have at all times acted willfully and/or knowingly.

97.     As a direct and proximate cause and result of Mr. Dorsey's and Mr. McKelvey's actions alleged above, Dr. Morley has no adequate legal remedy, has been irreparably injured, and has suffered monetary damages in an as yet undetermined amount.  Also as a direct and proximate cause and result of Mr. Dorsey's and Mr. McKelvey's actions alleged above, Defendants have been unjustly enriched.

## COUNT THREE: UNJUST ENRICHMENT

98.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

99.  As discussed above, Dr. Morley provided considerable benefits to Mr. Dorsey, Mr. McKelvey, and Square, Inc.

100.  Mr. Dorsey, Mr. McKelvey, and Square, Inc. appreciated the benefits provided by Dr. Morley.

101.  Mr. Dorsey, Mr. McKelvey, and Square, Inc. received, accepted, and retained the benefits provided by Dr. Morley in circumstances that render that retention inequitable.  For example, Mr. Dorsey and Mr. McKelvey sought out Dr. Morley because of his expertise, used and relied on his expertise to create a business and develop the core technology that would enable the business, and cut him out of the newly formed Square, Inc. after receiving and realizing all of the benefits of Dr. Morley's expertise and contributions that were critical to creating the business.  Square, Inc. has been and continues to be unjustly enriched by filing patent applications claiming inventions that were at least jointly co-invented and jointly owned by Dr. Morley.

102.  After accepting and retaining the benefits provided by Dr. Morley, Defendants excluded Dr. Morley from ownership in and control of the business, and deprived him of just compensation for the benefits he provided.

103.  As a result of Dr. Morley's contributions, the value of Square, Inc. has grown to a recent valuation of $5 billion.

104.  Defendants cannot establish any justification for their unjust enrichment at the expense of Dr. Morley.

105.  Defendants' actions described above have at all times been willful and/or knowing.

106.  As a direct and proximate result of Defendants' actions alleged above, Dr. Morley has no adequate legal remedy, has been irreparably injured, and has suffered monetary damages.

Also as a direct and proximate cause and result of Defendants' actions alleged above, Defendants have been unjustly enriched.

## COUNT FOUR: PATENT INFRINGEMENT

107.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

108.  As described below, Square, Inc. has infringed and continues to infringe the '946 patent.

109.  The first generation of Square, Inc.'s Square Reader, Square's servers that communicate with the first generation of Square, Inc.'s Square Reader, and the Square app, which is configured to operate with the first generation of Square, Inc.'s Square Reader (the "Accused Instrumentalities") meet one or more claims of the '946 patent.

110.  Square, Inc. has made/makes, has used/uses, has offered/offers to sell, has sold/sells and/or has imported/imports Square, Inc.'s Accused Instrumentalities within the United States or into the United States without authority from REM.

111.  Square therefore infringes the '946 patent under 35 U.S.C. § 271(a).

112.  Square, Inc. has actual knowledge of the '946 patent.  For example, Square, Inc. applied for an inter partes review of the '946 patent in the U.S. Patent and Trademark Office on or about December 31, 2013.

113.  Square, Inc. indirectly infringes the '946 patent by inducing infringement by others, such as end-user customers, by, for example, instructing end-user customers to install and use Square, Inc.'s Accused Instrumentalities in the United States.  As another example, Square, Inc. induces infringement by others such as Apple, Inc., by, for example, encouraging Apple, Inc. to offer to sell and sell Square, Inc.'s Accused Instrumentalities in the United States.

114.  Square, Inc. took the above actions intending to cause infringing acts by others.

-16-

115.  Square, Inc. was aware of the '946 patent and knew that the others' actions, if taken, would constitute infringement of the '946 patent.  Alternatively, Square, Inc. believed there was a high probability that others would infringe the '946 patent but remained willfully blind to the infringing nature of others' actions.  Square, Inc. therefore infringes the patents-in-suit under 35 U.S.C. § 271(b).

116.  Square, Inc. indirectly infringes the '946 patent by contributing to infringement by others, such as end-user customers by offering to sell and/or selling within the United States products that contain components that constitute a material part of the inventions claimed in the '946 patent, and components of products that are used to practice one or more processes/methods covered by the claims of the '946 patent and that constitute a material part of the inventions claimed in the '946 patent.  Such components are, for example, the components of the Accused Instrumentalities that are capable of reading a magnetic stripe, attenuating the read signal, and outputting the attenuated signal to the audio jack of the Accused Instrumentalities.

117.  In the above offering to sell and/or selling, Square, Inc. has known these components to be especially made or especially adapted for use in an infringement of the '946 patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Square, Inc. believed there was a high probability that others would infringe the '946 patent but remained willfully blind to the infringing nature of others' actions.  Square, Inc. therefore infringes the '946 patent under 35 U.S.C. § 271(c).

118.  Square, Inc.'s acts of infringement have caused damage to REM.  REM is entitled to recover from Square, Inc. the damages sustained by REM as a result of Square, Inc.'s

wrongful acts in an amount adequate to compensate REM for Square Inc.'s infringement subject to proof at trial.  In addition, the infringing acts and practices of Square, Inc. have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to REM for which there is no adequate remedy at law, and for which REM is entitled to injunctive relief under 35 U.S.C. § 283.

119.   Square, Inc. has committed and continues to commit acts of infringement under 35 U.S.C. § 271 with the Accused Instrumentalities.  In committing these acts of infringement, Square, Inc. acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, and Square, Inc. actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

120.   Square, Inc.'s infringement of the '946 patent has been and continues to be willful.

121.   To the extent that Square, Inc. releases any new version of the Accused Instrumentalities, such instrumentalities meet the claims of the '946 patent and infringe 35 U.S.C. § 271(a)-(c) in ways analogous to Square, Inc.'s current infringement described above.

## COUNT FIVE: CONSTRUCTIVE TRUST

122.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

123.   As a result of Defendants' actions described above, Dr. Morley has been wrongfully deprived of the right, title, benefit, and interest in Square, Inc.

124.   The deprivation of Dr. Morley's right, title, benefit, and interest in Square, Inc. has come as a result of the acts described above.

125.   As a direct and proximate cause and result of Defendants' actions alleged above, Dr. Morley has no adequate legal remedy and has been irreparably injured.  Also as a result of Defendants' actions alleged above, Defendants have been unjustly enriched.

## COUNT SIX: CIVIL CONSPIRACY

126.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

127.    Mr. Dorsey and Mr. McKelvey are two or more persons.

128.    Mr. Dorsey and Mr. McKelvey conspired with objective of owning the lion's share of the company.

129.    Mr. Dorsey and Mr. McKelvey came to a meeting of the minds as to the objective of owning the lion's share of the company.

130.    Mr. Dorsey and Mr. McKelvey committed unlawful, overt acts in furtherance of their conspiracy, including acts of breach of their joint venture agreement, breach of their fiduciary duties to Dr. Morley, unjust enrichment, conversion, defrauding Dr. Morley, filing for and receiving patents claiming and describing inventions that when such inventions were at least co-invented and jointly owned by Dr. Morley, misappropriation of Dr. Morley's trade secrets, and falsely claiming co-inventorship of Dr. Morley's invention in a lawsuit.

131.    As a direct and proximate cause and result of Messrs. Dorsey's and McKelvey's conspiracy, Dr. Morley was harmed and continued to be harmed by, for example, being excluded from ownership in and control of the business, being deprived of just compensation for the benefits he conferred to the business, and having to defend himself against McKelvey's and Square, Inc.'s baseless lawsuit.

132.    As a result of Messrs. Dorsey's and McKelvey's conspiracy, they are jointly liable for the unlawful acts committed against Dr. Morley.

## COUNT SEVEN: NEGLIGENT MISREPRESENTATION

133.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

134.    Mr. McKelvey supplied information to Dr. Morley in order to further his own pecuniary interest in developing a business to process credit card transactions using a mobile device.

135.    Mr. McKelvey did not take reasonable care in obtaining or communicating this information.

136.    Due to Mr. McKelvey's failure to exercise reasonable care, the information he communicated to Dr. Morley was false.

137.    Mr. McKelvey deliberately communicated the information to Dr. Morley for the purpose of developing a business to process credit card transactions using a mobile device.

138.    Due to the special relationships between Dr. Morley and Mr. McKelvey as described above, it was reasonable for Dr. Morley to rely on the information provided by Mr. McKelvey.

139.    As a direct and proximate cause and result of Mr. McKelvey's actions alleged above, Dr. Morley has suffered damages.

## COUNT EIGHT: FRAUD

140.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

141.    In February 2009, Mr. McKelvey made representations to Dr. Morley in order to persuade Dr. Morley to assist in developing a business to process credit card transactions using a mobile device.  Specifically, Mr. McKelvey represented to Dr. Morley that Dr. Morley would be a member of a joint venture to develop a business to process credit card transactions using a mobile device.

142.    To the extent that Defendants contend that they did not form a joint venture with Dr. Morley, these representations were false.

143. These representations were material.  For example, Dr. Morley relied on these representations in contributing to and taking part in the joint venture to develop a business to process credit card transactions using a mobile device, and he would not have done so in the absence of these representations.

144. Mr. McKelvey knew his representations were false, or, at a minimum, was ignorant of the truth of his representations.

145. Mr. McKelvey made his representations with the intent to persuade Dr. Morley to assist in developing a business to process credit card transactions using a mobile device.

146. Dr. Morley was unaware that Mr. McKelvey's representations were false.

147. Dr. Morley relied on Mr. McKelvey's representations as true when deciding to contribute to and take part in the joint venture to develop a business to process credit card transactions using a mobile device.

148. Dr. Morley had a right to rely on Mr. McKelvey's representations as true.  For example, as described above, Dr. Morley and Mr. McKelvey had a special and confidential relationship.

149. As a direct and proximate cause and result of Mr. McKelvey's fraud, Dr. Morley was harmed by, for example, being excluded from ownership in and control of the business and being deprived of just compensation for the benefits he conferred to the business.

## COUNT NINE: FRAUDULENT NONDISCLOSURE

150. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

151. To the extent that Messrs. Dorsey and McKelvey contend that a joint venture was not created, the two committed fraud in not correcting Dr. Morley's belief that he was a co-owner in the enterprise.

152.     By knowing that Dr. Morley believed that he was a co-owner of their joint enterprise, and by failing to inform Dr. Morley that they believed he was not a co-owner in their enterprise, Messrs. Dorsey and McKelvey made a false representation. For example, in September 2009 Mr. Dorsey, Mr. McKelvey, and Dr. Morley discussed the equity consideration to give a particular investor in exchange for venture capital funding.  At no point during this discussion did Messrs. Dorsey and McKelvey inform Dr. Morley that he was not a co-owner of their joint enterprise.

153.     Additionally, as described above, Dr. Morley contributed his services and expertise to the joint enterprise and received no compensation for his efforts, and at no time did Mr. Dorsey or Mr. McKelvey inform him that he would not receive joint ownership in and control of their joint enterprise.

154.     Messrs. Dorsey and McKelvey, by virtue of their joint venture relationship with Dr. Morley, had a duty to disclose their intent to exclude Dr. Morley from the company they planned to incorporate a business to process credit card transactions using Dr. Morley's invention.

155.     Messrs. McKelvey, by virtue of his special relationship with Dr. Morley, had a duty to disclose his intent to exclude Dr. Morley from the company he and Mr. Dorsey planned to incorporate to exploit Dr. Morley's invention.

156.     Information regarding Messrs. Dorsey and McKelvey intentions to exclude Dr. Morley was not reasonably available to Dr. Morley.

157.     Additionally, as noted above, Mr. McKelvey represented to Dr. Morley that he was part of the joint venture.  To the extent that Mr. McKelvey made this statement not knowing

that it was false, Mr. McKelvey had a duty to disclose that it was false when he discovered its falsity.

158. Messrs. McKelvey and Dorsey knew their silence was misleading.

159. Messrs. McKelvey and Dorsey maintained their silence with the intent to persuade Dr. Morley to continue assisting in developing a business to process mobile credit card transactions using Dr. Morley's invention.

160. Dr. Morley was unaware that Mr. McKelvey and Mr. Dorsey's silence was falsely misleading.

161. Dr. Morley relied on Messrs. McKelvey and Dorsey's silence by continuing to contribute to and take part in the joint venture to develop a business to process mobile credit card transactions using Dr. Morley's invention.

162. Dr. Morley had a right to rely on Messrs. McKelvey and Dorsey's silence.  For example, as described above, Dr. Morley and Mr. McKelvey had a special and confidential relationship and Mr. Dorsey was Dr. Morley's business partner.

163. As a direct and proximate cause and result of Messrs. Dorsey and McKelvey's fraud, Dr. Morley was harmed by, for example, being excluded from ownership in and control of the business and being deprived of just compensation for the benefits he conferred to the business.

**COUNT TEN: CORRECTION OF INVENTORSHIP**

164. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

165. When Dr. Morley was involved in the joint venture, one of his contributions was conceiving and developing methods for decoding the signal from a card reader into information indicative of the data encoded on the card.

166.  In this work, Dr. Morley taught Mr. Wen about how data is represented on a magnetic stripe, how that data is represented in a signal that is produced by a card reader upon swiping a magnetic stripe, and how that signal could be decoded to identify information indicative of the data encoded on the card.

167.  Dr. Morley disclosed methods to Mr. Wen that were used to decode the signals produced by the card reader that Dr. Morley invented into information indicative of the data encoded on the card.

168.  Dr. Morley collaborated with Mr. Wen to incorporate these methods into the Square app.

169.  Under Dr. Morley's direction, Mr. Wen worked on computer code to implement these methods to decode the signal from a card reader to obtain the data from a magnetic stripe.

170.  Before working with Dr. Morley, Mr. Wen had no significant experience with magnetic stripe technology or methods for decoding a signal from a card reader to obtain the data from a magnetic stripe.

171.  In this work, Dr. Morley conceived and developed solutions to the problems associated with decoding a signal from a card reader to obtain the data from a magnetic stripe.

172.  Square, Inc. has filed for and received several patents that incorporate Dr. Morley's solutions into several of the claims of the patents, including United States Patent Nos. 8,231,055 (the "'055 patent") (attached as Ex. C), 8,235,287 (the "'287 patent") (attached as Ex. D), 8,302,860 (the "'860 patent") (attached as Ex. E), 8,413,901 (the "'901 patent") (attached as Ex. F), 8,500,018 (the "'018 patent") (attached as Ex. G), 8,534,546 (the "'546 patent") (attached as Ex. H), 8,571,989 (the "'989 patent") (attached as Ex. I), 8,573,487 (the "'487 patent") (attached as Ex. J), 8,573,489 (the "'489 patent") (attached as Ex. K), 8,584,956 (the "'956 patent") (attached as Ex. L), 8,602,305 (the "'305 patent")

(attached as Ex. M), and 8,612,352 (the "'352 patent") (attached as Ex. N). Because Dr. Morley contributed in a significant manner to the conception of at least claims 1, 3, 5, 9, 11, 16, 17, 21, and 23 of the '055 patent, claims 1, 3, 4, 7, 8, 14, 16, 17, 18, 27, 28, and 32 of the '287 patent, claim 1 of the '860 patent, claims 1, 3, 5, 9, and 11 of the '901 patent, claims 1, 4, 10, 11, 15, 17, 18, 26, 27, and 31 of the '018 patent, claims 1, 12, and 13 of the '546 patent, claims 1, 9, 11, 15, and 17 of the '989 patent, claims 1, 2, 3, and 14 of the '487 patent, claims 1, 10, 12, and 18 of the '489 patent, claims 1, 3, 8, 9 and 10 of the '956 patent, claims 1, 10, 12, 16, and 18 of the '305 patent, and claims 1, 3, 5, 7, 9, and 11 of the '352 patent , he is properly considered a co-inventor of the inventions claimed in the '055 patent, the '287 patent, the '860 patent, the '901 patent, the '018 patent, the '546 patent, the '989 patent, the '487 patent, the '489 patent, the '956 patent, the '305 patent, and the '352 patent. The failure to name Dr. Morley as a co-inventor on the '055 patent, the '287 patent, the '860 patent, the '901 patent, the '018 patent, the '546 patent, the '989 patent, the '487 patent, the '489 patent, the '956 patent, the '305 patent, and the '352 patent occurred without any deceptive intent on the part of Dr. Morley.

173. REM has standing to assert this count because it is the assignee of Dr. Morley's rights in Square's patents listed above.

174. During the prosecution of the '055 patent, the '287 patent, the '860 patent, the '901 patent, the '018 patent, the '546 patent, the '989 patent, the '487 patent, the '489 patent, the '956 patent, the '305 patent, the '352 patent and thereafter, Square, Inc. failed to disclose to the PTO all of the actual inventors of the subject matter of one or more claims of the '055 patent, the '287 patent, the '860 patent, the '901 patent, the '018 patent, the

'546 patent, the '989 patent, the '487 patent, the '489 patent, the '956 patent, the '305 patent, and the '352 patent.

175.   By reason of the foregoing, REM seeks and is entitled to an Order from the Court, pursuant to 35 U.S.C. § 256, ordering correction of the '055 patent, the '287 patent, the '860 patent, the '901 patent, the '018 patent, the '546 patent, the '989 patent, the '487 patent, the '489 patent, the '956 patent, the '305 patent, and the '352 patent to list Dr. Morley as a co-inventor.

## COUNT ELEVEN: CONVERSION

176.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

177.   As part of their breach of fiduciary duties, unjust enrichment, negligent misrepresentation, and fraud, Defendants tortiously took Dr. Morley's solutions to the problems associated with decoding a signal from a card reader to obtain the data from a magnetic stripe.

178.   Defendants appropriated Dr. Morley's solutions to the problems associated with decoding a signal from a card reader to obtain the data from a magnetic stripe for their own use.

179.   Defendants filed for and received the '055 patent, the '287 patent, the '860 patent, the '901 patent, the '018 patent, the '546 patent, the '989 patent, the '487 patent, the '489 patent, the '956 patent, the '305 patent, and the '352 patent.  The patents indicate that Square, Inc. is the sole owner of such patents in opposition to Dr. Morley's rights as a true co-owner.

## COUNT TWELVE: MISAPPROPRIATION OF TRADE SECRETS

180.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

181.   Before the publication of United States patent application number 12/456,134, Dr. Morley's invention of reading the magnetic stripe of a card with a card reader, inputting

the signal of the card reader into the audio jack of a mobile device, and decoding that signal into the card information using the processing capability of the mobile device was a trade secret.

182.   Dr. Morley's card reader invention derived independent economic value from not being generally known to other persons who could obtain economic value from its disclosure and was not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure.  For example, Dr. Morley's card reader invention gave Square, Inc. a head start in the mobile card transaction industry, and this head start enabled Square, Inc. to capture significant market share.  Had Dr. Morley's invention been generally known or readily ascertainable by proper means by, for example, Square, Inc.'s competitors, such competitors could have entered the mobile card transaction market earlier than they did to the detriment of Square, Inc.'s market share.

183.   Before the publication of United States patent application number 12/456,134, Dr. Morley's card reader invention was the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  For example, Dr. Morley disclosed his card reader invention to Defendants in confidence, and Square, Inc.'s employees were instructed not to disclose Dr. Morley's card reader invention.

184.   Additionally, Dr. Morley's methods for decoding the signal from a card reader into information indicative of the data encoded on the card are a trade secret.

185.   Dr. Morley's decoding methods derived independent economic value from not being generally known to other persons who could obtain economic value from its disclosure and was not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure.  For example, Dr. Morley's decoding methods

enabled Square, Inc.'s card readers to interoperate with certain mobile devices, and this increased interoperability increased Square, Inc.'s market share as to individuals with those mobile devices.  Had Dr. Morley's decoding methods been generally known or readily ascertainable by proper means by, for example, Square, Inc.'s competitors, such competitors could have marketed competing card readers to individuals with certain mobile devices to the detriment of Square, Inc.'s market share.

186.    Dr. Morley's decoding methods were the subject of efforts that are reasonable under the circumstances to maintain their secrecy.  For example, Dr. Morley disclosed his decoding methods to Defendants in confidence, and Square, Inc.'s employees were instructed not to disclose Dr. Morley's card reader invention.

187.    Defendants have misappropriated the trade secrets described above (i.e., Dr. Morley's card reader invention and Dr. Morley's decoding methods).

188.    Defendants have misappropriated the trade secrets described above without Dr. Morley's consent by disclosing and using the trade secrets described above by, for example, distributing card readers and apps using Dr. Morley's trade secrets and by filing patent applications with the United States Patent and Trademark Office describing Dr. Morley's trade secrets.

189.    Defendants have further misappropriated the above trade secrets, such as by breaching of their joint venture agreement, breaching their fiduciary duties, fraud, and fraudulent nondisclosure as described in the above counts, to acquire knowledge of and to use Dr. Morley's trade secrets.

190.    Additionally, Defendants have misappropriated those trade secrets, in that at the time Defendants have disclosed and used Dr. Morley's inventions, Defendants knew or had

reason to know that their knowledge of Dr. Morley's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. For example, Dr. Morley disclosed his trade secrets to Defendants in confidence, and Defendants therefore had a duty to maintain its secrecy or limit their use of Dr. Morley's trade secrets.

191.    Further, such misappropriation has occurred, as at the time Defendants have disclosed and used Dr. Morley's inventions, Defendants knew or had reason to know that their knowledge of Dr. Morley's trade secrets was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use. For example, Square, Inc. derived their knowledge of Dr. Morley's trade secrets from or through at least Mr. McKelvey and Mr. Wen, who owed a duty to Dr. Morley to maintain the secrecy of Dr. Morley's trade secrets or limit its use.

192.    As a direct and proximate cause and result of Defendants' misappropriation of Dr. Morley's trade secrets, Dr. Morley was harmed.

193.    Defendants carried out the actions described above with evil motive and reckless indifference to Dr. Morley's rights, and have at all times acted willfully and/or knowingly.

194.    As a direct and proximate cause and result of Defendants' actions alleged above, Dr. Morley has no adequate legal remedy, has been irreparably injured, and has suffered monetary damages in an as yet undetermined amount. Also as a direct and proximate cause and result of Defendants' actions alleged above, Defendants have been unjustly enriched.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury for all issues so triable.

## PRAYER FOR RELIEF

1. A judgment that Mr. Dorsey and Mr. McKelvey breached their joint venture agreement with Dr. Morley and their fiduciary duties to Dr. Morley, that Square, Inc., Mr. Dorsey, and Mr. McKelvey unjustly enriched themselves to the detriment of Dr. Morley, that Square, Inc., Mr. Dorsey, and Mr. McKelvey hold ownership of Square, Inc. in constructive trust for Dr. Morley, that Mr. Dorsey and Mr. McKelvey engaged in a civil conspiracy to commit unlawful acts against Dr. Morley, that Mr. McKelvey made negligent misrepresentations to Dr. Morley, that Mr. McKelvey and Mr. Dorsey committed fraud against Dr. Morley, that Square, Inc., Mr. Dorsey, and Mr. McKelvey converted Dr. Morley's solutions to the problems associated with decoding a signal from a card reader to obtain the data from a magnetic stripe, that Square, Inc. has directly infringed the '946 patent, contributorily infringed the '946 patent, and/or induced the infringement of the '946 patent, that Defendants misappropriated Dr. Morley's trade secrets, and that Dr. Morley is a co-inventor on the '055 patent, the '287 patent, the '860 patent, the '901 patent, the '018 patent, the '546 patent, the '989 patent, the '487 patent, the '489 patent, the '956 patent, the '305 patent, and the '352 patent;

2. A judgment and order that Defendants hold ownership of Square, Inc. in constructive trust for Dr. Morley;

3. A judgment and order requiring Mr. Dorsey and Mr. McKelvey to pay actual and consequential damages resulting from the breach of their joint venture agreement with Dr. Morley;

4. A judgment and order requiring Mr. Dorsey and Mr. McKelvey to pay economic and punitive damages resulting from the breach of their fiduciary duties to Dr. Morley;

5.  A judgment and order requiring Square, Inc., Mr. Dorsey, and Mr. McKelvey to pay the value of the benefit provided by Dr. Morley that would be unjust for Defendants to retain;

6.  A judgment and order holding Mr. Dorsey and Mr. McKelvey jointly-liable for their unlawful acts against Dr. Morley;

7.  A judgment and order requiring Mr. McKelvey to pay economic damages resulting from his negligent misrepresentations to Dr. Morley;

8.  A judgment and order requiring Mr. McKelvey and Mr. Dorsey to pay economic, special, and punitive damages resulting from their fraud against Dr. Morley;

9.  A judgment and order requiring Square, Inc., Mr. Dorsey, and Mr. McKelvey to pay fair market value for Dr. Morley's solutions to the problems associated with decoding a signal from a card reader to obtain the data from a magnetic stripe at the time of their conversion;

10. A judgment and order requiring Square, Inc., Mr. Dorsey, and Mr. McKelvey to pay damages including unjust enrichment, disgorgement of Defendants' profits, a reasonable royalty for Defendants' misappropriation of Dr. Morley's trade secrets as well as a judgment and order requiring Square, Inc., Mr. Dorsey, and Mr. McKelvey to pay punitive damages for Defendants' misappropriation of Dr. Morley's trade secrets;

11. A judgment and order directing the Director of the United States Patent and Trademark Office to issue a certificate correcting the '055 patent, the '287 patent, the '860 patent, the '901 patent, the '018 patent, the '546 patent, the '989 patent, the '487 patent, the '489 patent, the '956 patent, the '305 patent, and the '352 patent by listing Dr. Morley as a co-inventor.

12. A preliminary and permanent injunction preventing Mr. Dorsey, Mr. McKelvey, Square, Inc. and their officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '946 patent;

13. A judgment that Square, Inc.'s infringement of the '946 patent has been willful;

14. A judgment and order requiring the Square, Inc., to pay REM damages under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed, and enhanced damages for willful infringement as provided by 35 U.S.C. § 284;

15. A ruling that this case be found to be exceptional under 35 U.S.C. § 285, and a judgment awarding to REM their attorneys' fees incurred in prosecuting Square, Inc.'s infringement in this action;

16. A judgment and order awarding to Plaintiffs their attorneys' fees;

17. A judgment and order requiring the Square, Inc., to pay Plaintiffs the costs of this action (including all disbursements);

18. A judgment and order requiring the Square, Inc., to pay Plaintiffs pre-judgment and post-judgment interest on the damages awarded;

19. A judgment and order requiring that, in the event a permanent injunction preventing future acts of infringement is not granted, REM be awarded ongoing royalties;

20. Such other and further relief as the Court may deem just and proper.

Dated: January 30, 2014

Respectfully submitted,

**CALDWELL CASSADY & CURRY**

Bradley W. Caldwell
Texas State Bar No. 24040630
*(motion for pro hac vice to be filed)*
Email:  bcaldwell@caldwellcc.com
Jason D. Cassady
Texas State Bar No. 24045625
*(motion for pro hac vice to be filed)*
Email:  jcassady@caldwellcc.com
John Austin Curry
Texas State Bar No. 24059636
*(motion for pro hac vice to be filed)*
Email:  acurry@caldwellcc.com
**CALDWELL CASSADY & CURRY**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849


  /s/David B. B. Helfrey
David B. B. Helfrey, #35911 MO
Email: dhelfrey@sandbergphoenix.com
**SANDBERG PHOENIX & VON GONTARD**
600 Washington Avenue, 15th Floor
St. Louis, Missouri 63101
Telephone: (314) 231-3332
Facsimile: (314) 241-7604


William B. Cunningham, #20998 MO
Email: wcunningham@PolsterLieder.com
McPherson D. Moore, #26056 MO
Email: mmoore@PolsterLieder.com
**POLSTER LIEDER WOODRUFF &
LUCCHESI, L.C.**
12412 Powerscourt Dr., Suite 200
St. Louis, MO 63131
Telephone: (314)238-2400
Facsimile: (314)238-2401


**ATTORNEYS FOR PLAINTIFFS
ROBERT E. MORLEY, JR. AND
REM HOLDINGS 3, LLC**

-33-